## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ACIE ROBINSON**                                        **CIVIL ACTION**

**VERSUS**                                              **NO. 14-1530-NJB-SS**

**CAROLYN W. COLVIN, ACTING**
**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

Plaintiff, Acie Robinson ("Robinson"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423.

## PROCEDURAL HISTORY

On July 24, 2013, Robinson completed an application for disability insurance benefits. He alleged that he became unable to work on March 31, 2010.  R. 129-130.  Robinson retired from the Navy in March 2010.  R. 13 at para. 4.  Robinson had made prior applications for disability in October 2010 and November 2012.  R. 16 at para. 3.  Robinson listed post-traumatic stress disorder ("PTSD"), depression, osteoarthritis and problems with his neck, back and knees as disabling conditions.  R. 151.

On December 9, 2013, the Commissioner determined that Robinson was not disabled.  R. 90 and 91-95.  On February 19, 2014, there was a hearing before an Administrative Law Judge ("ALJ") with testimony from Robinson and a vocational expert.  R. 34-35.  Robinson was not represented by counsel.  R. 37.  On March 25, 2014, the ALJ issued an unfavorable decision.  R. 7-28.  On May 6, 2014, the Appeals Council denied the request for review.  R. 1-5

On July 2, 2014, Robinson filed a complaint for review of the Commissioner's decision.

Rec. doc. 1. The Commissioner filed an answer and the administrative record. Rec. docs. 8 and

9. The parties filed cross-motions for summary judgment. Rec. docs. 11 and 12.

## STATEMENT OF ISSUES ON APPEAL

Issue No. 1.  Is the ALJ's finding that Robinson could perform frequent bilateral fingering, feeling, and handling contrary to the evidence of record?

Issue No. 2.  Did the ALJ properly find that Robinson could perform the standing and walking requirements of light work?

Issue No. 3.  Does substantial evidence support the ALJ's mental residual functional capacity ("RFC") assessment?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1. Robinson met the insured status requirements of the Act through December 31, 2015.

2. Robinson has not engaged in substantial gainful activity since March 31, 2010, the alleged onset date (20 C.F.R. § 404.1571 et seq.).

3. Robinson has the following severe impairments: cervical radiculopathy and degenerative disc disease; right knee arthritis; left wrist arthritis; bilateral carpal tunnel syndrome; depression; and post-traumatic stress disorder (20 C.F.R. §§ 404.1520(c)).

4. Robinson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5. Robinson has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except with frequent bilateral fingering, feeling, and handling; occasional bilateral overhead reaching; simple, routine tasks; and occasional interaction with supervisors, coworkers, and the public.

6. Robinson is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. Robinson was born in 1969 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. Robinson has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Robinson is "not disabled," whether or not Robinson has transferable job skills (See SSR 82-14 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering Robinson's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Robinson can perform (20 C.F.R. §§ 404.1569 and 416.1569(a)).

11. Robinson has not been under a disability, as defined by the Act, from March 31, 2010, through the date of this decision (20 C.F.R. § 404.1520(g)).

R. 10-27.

## ANALYSIS

a. **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461.  Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461;

Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).  When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.  "In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  Perez v. Barnhart, 415 F.3d at 462.  "The Commissioner, rather

---

[1]  The five-step analysis requires consideration of the following:

> First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

> Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

> Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

> Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

> Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

than the courts, must resolve conflicts in the evidence." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.      **Testimony at Hearing**.

Robinson was born in 1969.  R. 40.  He completed the twelfth grade.  R. 43.  He began serving in the Navy in April 1988. R. 43.  He received additional training in the Navy.  R. 43. On retirement from the Navy, he was a chief petty officer.  R. 49.  His work included hazardous waste handler on a base (R. 49) and launch and recovery operator on an aircraft carrier from 1997 to 2002 (R. 50).  He served on different aircraft carriers for over 15 years.  R. 50.  He did maintenance work on catapults that launch the planes and the wires that catch them as they land. R. 52.  A lot of the work was in confined spaces, so he spent a lot of time on his knees.  R. 53. His longest deployment was about a year in 2003.  R. 49.  From 2007 until his retirement he was stationed in Pensacola where he did administrative work to process people out of the Navy.  R. 51.  He asked for the administrative job because he could not take the physical and mental strain on aircraft carriers.  R. 53.

On March 31, 2010, Robinson retired because it was too rough mentally and he was diagnosed with problems in his knees and neck.  R. 42-43.  He received retirement income and disability from the Navy and VA.  R. 42.  A couple of months after he retired he applied for a maintenance supervisor position, but was not hired.  R. 65-66.  He also applied for an office job with Wal-Mart distribution but did not get it.  R. 66.  As a retired Navy chief, it was not easy for him to adjust.  R. 67.

He had surgery on his right knee.  All the cartilage is gone; it is "bone to bone."  He did not want a knee replacement.  R. 44.  He has spondylosis in his neck.  There is degenerative joint disease which is causing pinched nerves. R. 44.  He had surgery on his left knee in 2008.  His

6

last physical therapy was in 2011.  R. 45.  He is unable to work because of his knee, neck and carpal tunnel problems.  R. 47.  Sometimes he can barely write.  R. 47.  Wearing braces at night for the carpal tunnel syndrome helped some.  R. 45 and 48.

Robinson suffered from depression because of the transition from military to civilian life. R. 46.  He received treatment, including Thorazine, for his depression.  R. 46.  It helped.  Since early 2012, he saw a psychiatrist on a regular basis R. 46-47 and 56.  He was unable to work because of his PTSD, depression, and serious mood swings.  He suffered from flashbacks from his military service.  R. 47.  He took medication for depression and to help him sleep and muscle relaxers for his nerves.  R. 56.

Robinson drank alcohol occasionally.  He drank about a 12 pack of beer about three or four times a week.  R. 54-55.  He did not use recreational drugs.  R. 55.  When he drank alcohol, he did not take medication.  R. 55.

During a typical day, he slept and watched TV.  R. 57.  He did household chores, including washing dishes, laundry, and going to the grocery store.  R. 57-58.  He ate sandwiches and food prepared in a microwave.  R. 57.  Two near-by friends came to see him two to three times a week.  R. 58-59.  They usually talked and drank beer together.  R. 59.  He lived in a rural area.  R. 59.  When he became bored with sleeping and watching TV, he went outside, sat on his steps, smoked a cigarette, and walked down the street.  R. 60.  He smoked quite a bit.  R. 63.

Robinson checked on his mother when he went to her house to pick up his mail.  R. 61. His girlfriend visited him weekends, but she had a busy work schedule.  R. 61.  She was an old friend.  They had been going out for about a year and a half.  She lived in Baton Rouge.  R. 61. He drove to her house in Baton Rouge about four times in the summer of 2013.  R. 62.  When she came to his house, they watched TV.  R. 62.

Robinson used to play basketball, but he could not because of knee problems.  R. 63.  For exercise, he rode his bike in the neighborhood or took a walk.  R. 63.  He tried to ride his bike every day.  R. 63.  The doctor said bike riding put less stress on his knees.  R. 64.

Robinson was right handed.  R. 41.  He was divorced.  R. 41.  He had two daughters, who were 25 and 24 and who did not live with him.  R. 41.  He lived by himself.  R. 41-42.  He had a driver's license.  R. 42.  He drove to the hearing.  R. 42-43.

Based on the ALJ's hypothetical question, the vocational expert testified that Robinson could not perform any of his past jobs.  R. 71.  There were light duty jobs that he could perform, for example gaming surveillance monitor.  R. 71.  If he had to be off task 20 percent of the work day, there were no jobs that he could perform.  R. 74.

c.     **Medical Evidence**.

In 2008, there was arthroscopic surgery of the left knee with meniscetomy.  R. 235.  In February 2009, Robinson was involved in an ATV accident, in which his right knee was injured. He was treated conservatively.  The pain was worse with bending.  R. 273.

## 2010

On February 24, 2010, there was an MRI of the right knee.  The impression was complete tear of the MCL and ACL, suggestion of a sprain, marrow edema, small joint effusion and defect within the lateral femoral condyle.  R. 1023.

On October 29, 2010, Robinson's address was in Pensacola, Florida.  R. 235.  He went to a VA health facility for a health maintenance wellness exam.  R. 239.  He was unemployed but looking for work, primarily "supervisor-type work".  R. 240.  For exercise he rode his bike and walked.  R. 241.

Robinson smoked one to two packs of cigarettes per day.  R. 241.  Kenneth Counselman, M.D., and Nurse Hargis described the risks of tobacco use and advised him to quit.  R. 244-45 and 251.  He did not want to go to a tobacco cessation clinic or receive medication to quit smoking.  R. 245 and 251.  He admitted drinking four or more times per week and 10 or more drinks at a time.  R. 241.  Dr. Counselman advised him to abstain from alcohol use.  R. 245.  He agreed to limit himself to eight drinks per week and two drinks per occasion.  R. 245.

Robinson reported right knee pain.  R. 248.  The pain was a two on a ten point scale.  For him a tolerable level of pain was five.  R. 243.  On examination, he was alert, orientated, and healthy.  He had a depressed and fatigued voice.  He tested positive for depression.  A PTSD screen was negative.  R. 242.  There were normal reflexes and mobility of joints in both upper and lower extremities on the physical examination.  R. 242.  There was a positive drawer sign on the right knee.  His gait was normal.  R. 242.

Dr. Counselman prescribed Cyanocobalamin and Folic Acid Thiamine as a vitamin supplement.  R. 245 and 253.  Robinson was given a flu vaccination.  R. 250.  A follow-up appointment was set for December 1, 2010.  R. 239 and 244.

Dr. Counselman referred Robinson to Kathy Monson, LCSW, for an evaluation of his mental health issues.  R. 244 and 247.  On November 1, 2010, Ms. Monson spoke to Robinson to schedule an appointment for November 3, 2010.  R. 247.  Robinson was unable to keep the appointment.  It was reset for November 4, 2010.  R. 238.  It was canceled by Robinson.  R. 237.

On December 2, 2010 and in connection with his first application for disability, Robinson was seen by a psychologist, Randi N. McDonald, Ph.D., whose report was dated December 16, 2010.  R. 255-58.  Robinson reported that his disability was due to intervertebral disc syndrome, limited knee flexion, tendon inflammation, median nerve paralysis, degenerative arthritis, spinal

injuries, and mild depression.  R. 255.  He reported consuming alcohol in varying amounts.  He would consume a 12-pack of beer daily when he had a lot on his brain and was slightly depressed.  R. 256.  He smoked a pack a day of cigarettes.  R. 256.  He reported surgery on his left elbow and knee.  He reported knee and back problems.  He was not taking any medication.  R. 256  Dr. McDonald noted that Robinson accompanied him to an office on the second floor with no disturbance of gait or balance.  R. 256.  The current GAF was 65.  "His ability to tolerate the mental demands associated with working appeared generally good."  R. 258.  He did not present as significantly impaired on the whole, but there was indication that he engaged in behaviors that would result in continued problems.  R. 258.

## 2011

The Southeast Louisiana Veterans Health Care System provided records of Robinson's treatment from June 28, 2011 through December 11, 2012.  R. 260-459.

On June 28, 2011, there was an outpatient visit with Frederick E. Hackley, M.D.  The diagnoses were insomnia, anemia, chronic airway obstruction, tobacco use disorder and alcohol dependence.  R. 260, 262, 271 and 681.  On July 1, 2011, there was a telephone contact concerning chronic airway obstruction.  R. 270.  On July 8, 2011, there was an outpatient visit with a report of blood in the stool.  R. 270.  On July 20, 2011, there was a pulmonary function for chronic airway obstruction.  The blood oxygen levels, breathing capacity, and respiratory flow were measured.  R. 270.

On July 21, 2011, Robinson filed a claim for increased evaluation by the Department of Veterans Affairs.  R. 482.  On August 3, 2011, there was a pulmonary function test.  A restrictive disorder could not be adequately evaluated by spirometry alone.  Lung volumes and diffusing capacity measurements were suggested for further evaluation.  R. 446-49.  On August 17, 2011,

there was an office visit.  The diagnoses were tobacco use disorder, anemia, osteoarthritis, and blood in the stool.  R. 269-70.  On August 19, 2011, there was a contact concerning insomnia and unspecified adjustment reaction.  R. 268-69.  On August 26, 2011, there was an arterial blood gas procedure.  R. 446-48.  On August 30, 2011, there was a pulmonary function test.  The static volumes demonstrated a mild restrictive abnormality.  There was a moderate reduction in the diffusing capacity.  R. 448.

On September 11, 2011, there was a telephone contact concerning abnormal results in the function study and other abnormal clinical findings.  R. 268.  On September 13, 2011, there was an outpatient visit concerning blood in his stool.  R. 268.  On October 25 and 27, 2011, there were telephone contacts.  R. 268.

On November 16, 2011, there was preventive medicine counseling and discussion of risk factors.  R. 268.  On November 21, 2011, there was a telephone contact concerning abnormal clinical findings.  R. 267-68.  On November 30 and December 3 and 5, 2011, there were telephone contacts.  R. 267.  On December 4, 2011 there was a note of anemia from chronic disease.  R. 261.  On December 16, 2011, there was a brief outpatient visit for unspecified reasons.  R. 267.

## 2012

On January 5, 2012, Robinson received vaccinations for flu and pneumonia.  R. 266-67. On January 6, 2012, there was a telephone contact to report abnormal clinical findings.  R. 266.

On February 3, 2012, there was an MRI of the cervical spine because of a history of cervicalgia and bilateral UE radiculopathy.  R. 453.  The impression was straightening of the cervical curvature with degenerative changes resulting in relative narrowing of the central canal

at C3-C4 and C6-C7.  Multilevel disc degenerative changes were present at C3-C4 through C6-C7 and T1-T2.  Multilevel foraminal narrowing was also noted.  R. 452-455 and 669-71.

On February 3, 2012, there was a nerve conduction study.  The impression was bilateral carpal tunnel syndrome affecting motor and sensory fibers right worse than left and chronic C-7 radiculopathy.  R. 266, 442-43, 445-46 and 964-66.

On February 10, 2012, there was a cervical spine series.  R. 452-53 and 668.  The impression was C5-6 compression deformity with associated degenerative changes and maintenance of anatomic alignment.  No acute bony abnormalities were seen.  R. 453.  The impression of an x-ray of the right knee was minor early degenerative changes.  No acute bony abnormalities were seen.  R. 452, 668-69 and 1017.

On February 25, 2012, Dr. Hackley notified Robinson that after reviewing the x-rays, MRI and other diagnostic studies, a neurosurgery appointment would be scheduled. R. 441.

On March 12, 2012, Robinson reported that he stopped abusing alcohol six weeks before. R. 436.  There was a decreased range of motion in the cervical spine.  R. 438.  There was no muscle atrophy.  R. 439.  The joints were pain free on a full range of motion.  R. 439.  He was alert.  He was not flagged as a high risk for falls.  He was to return in six months.  R. 440.

On April 26, 2012, there was a routine ultrasound of the abdomen because of abnormal liver function tests.  The result was a normal examination.  R. 451, 667-68 and 1016-17.

On May 25, 2012, there was a neurosurgery consult.  There was normal gait and motor power.  Neurosurgery was not warranted.  Robinson did not want surgery.  R. 429-30 and 265.

On June 11, 2012, it was noted that Robinson was applying for VA disability benefits.  R. 418.  A questionnaire was completed and dated June 25, 2012.  R. 418-29.  In February 2010, Robinson was involved in a roll-over ATV accident.  An MRI revealed right ACL and MCL

injuries.  Although surgery was recommended, he chose conservative care.  He was seen by a private orthopedist in 2010.  R. 419.  The condition was a separate disability from the service degenerative arthritis.  The right knee condition was the result of a traumatic knee injury sustained in the ATV accident and not a progression of arthritis.  The new condition was described as ACL injury/instability on the right and meniscus pain on the left knee.  The knee and lower leg conditions did not impact Robinson's ability to work.  R. 429.  Robinson used a brace on his left knee.  R. 427-28.

On June 14, 2012, a nurse administered screens for pressure ulcer, alcohol use, depression, and PTSD.  R. 414-16.

On June 15, 2012, Robinson reported neck pain radiating down his back.  The condition began years ago.  He tried physical therapy but did not try hard enough.  Using his arms made it worse.  He thought muscle relaxers helped him.  He was not interested in an injection.  He preferred physical therapy.  R. 402.  The results of the February 3, 2012 MRI (R. 453) were noted.  R. 403-04.  The physical examination by Sanyo Tsai, M.D., a resident physician, recorded pain on flexion and extension.  The gait was normal.  He could walk without assistance.  Muscle strength was normal.  R. 404.

On June 15, 2012, Robinson reported that pain was brought on by sleeping and neck movement.  R. 406.  He reported that medication had not worked well in controlling the pain.  R. 407.  Dr. Tsai signed a report that no additional physical therapy visits would be authorized until Robinson received additional physical evaluation by rehabilitation medicine doctors.  R. 401.

On June 15, 2012, there was a suicide risk assessment.  Suicide ideation thoughts, substance abuse (alcohol), anxiety, withdrawal, anger, recklessness (lately he spent a lot of

money) and mood change related to pain were noted.  R. 409-10.  Treatment would continue to reduce the suicide risk.  R. 410.  Robinson was to have a mental health evaluation.  R. 412.

On June 18, 2012, Dr. Hackley wrote to Robinson in response to his contact with Nurse Lovato, where he sought something for pain, a muscle relaxant and wrist braces.  He was provided with the wrist braces.  Ibuprofen was prescribed for arthritic pain.  Cyclobenzaprine was prescribed for pain.  He was urged to use the Ibuprofen as little as possible.  R. 400.

On June 25, 2012, Camalyn Gaines, M.D., completed a knee and lower leg conditions disability benefits questionnaire.  R. 418-29.  A right knee ACL injury, a menisectomy, and knee osteoarthritis were noted.  R. 418-19.  Robinson did not report flare-ups that impacted the function of the knee or lower leg.  R. 419.  The range of motion and extension were measured. R. 419-20.  There was no objective evidence of painful motion.  R. 421.  Robinson was able to perform repetitive-use testing with three repetitions.  R. 421.  He had tenderness or pain to palpation on the soft tissue for both knees.  R. 23.  For both knees, there was normal strength (5/5) for flexion and extension.  R. 423-24.  The joint stability tests were normal.  R. 424.  There was no evidence of recurrent patellar subluxation/dislocation.  R. 424.  He reported frequent episodes of joint pain from the meniscal surgery.  R. 425-26.  He used a brace.  R. 427-28.  The knee and/or lower leg conditions did not impact his ability to work.  R. 429.

On July 14, 2012, Dr. Hackley wrote to Robinson and reviewed his test results.  He noted an extremely high triglyceride.  It was twice as high as in December.  It caused pancreatitis and hardening of the arteries.  The fish oil dosage was doubled.  The liver tests were high.  He was told to stop drinking alcohol, if he wanted to save his liver and pancreas.  R. 398.  On July 18, 2012, Nurse Lovato wrote to offer resources to help him stop consuming alcohol.  R. 397.

On September 21, 2012, Robinson was seen for a mental health consult with James T. Russell, Ph.D., staff clinical psychologist. R. 386. The treatment plan was in response to symptoms of depression, including depressed mood, decreased energy, decreased socialization, poor concentration and difficulty falling asleep. R. 386. Dr. Russell was to see Robinson every four to eight weeks. John Kevin Jackson, M.D., staff psychiatrist, would prescribe medication and follow-up as needed. R. 387. Robinson was assessed at moderate risk. It was not recommended that he be flagged as high risk for suicide. R. 388-89. Dr. Russell found "[a]affect full range, appropriate and mood stable." R. 390. On September 21, 2010, there was a note of a psychiatry visit to Dr. Jackson. Robinson complained of trying to keep his sanity and problems with pain. He said surgery was needed for his neck. He rode his bike to stay in shape, but it was painful. He feared starting pain medication. He experienced difficulty sleeping. He was pressured by family for money, who believed that because he was retired military he had money. R. 391. His mood was depressed. Effexor, an antidepressant, was prescribed. He was to return in three months. R. 392.

On October 25, 2012, Robinson reported chronic pain and decreased range of motion in his left elbow and wrist. R. 450. An x-ray of the left wrist was positive for ulnar variance. There were mild degenerative changes. R. 450-51 and 666-67. The wrist condition did not impact his ability to work. R. 351. A minor abnormality was found in the x-ray of the left elbow. R. 449-50, 666 and 1015-16.

On October 25, 2012, questionnaires were completed in connection with Robinson's application for VA disability benefits. R. 352-386. The questionnaires concerned hearing loss and tinnitus (R. 353-362) and peripheral nerve condition (R. 363-379). Robinson's hearing loss and tinnitus impacted the ordinary conditions of daily life, including the ability to work. R. 360

and 362.  Robinson was diagnosed with cervical radiculopathy.  R. 364.  The elbow flexion was normal.  The muscle strength was normal.  R. 365-66.  There was no muscle atrophy.  R. 366.  There was decreased range of motion in the shoulder area (C5) and hand/fingers (C6-8). R. 367.  Robinson's gait was normal.  R. 368.  All of the nerves were normal, except there was mild incomplete paralysis of the median nerve (R. 369-70) and the upper radicular group (R. 371).  An EMG revealed bilateral carpal tunnel syndrome affecting motor and sensory fibers right worse than left.  R. 379.  The peripheral nerve condition affected his ability to work.  R. 382.

On October 31, 2012, Robinson was notified of abnormal results for an x-ray of the left elbow and left wrist.  R. 351-52 and 263.

On November 9, 2012, VA disability benefit questionnaires were completed for his knee and lower leg conditions (R. 272-284), cervical spine conditions (R. 284-295), wrist conditions (R. 295-304), and hearing loss and tinnitus conditions (R. 304-314).  The hearing loss condition impacted his ability to work.  R. 314.  The other conditions did not impact his ability to work.  R. 283, 295 and 303.

On December 5, 2012, Robinson was seen by Dr. Hackley.  R. 321-22.  A physical exam showed decreased range of motion in the neck.  There was no muscle atrophy and joints were pain-free on full range of motion without swelling, warmth, redness, crepitus or popping.  Cranial nerves were normal.  Strength was symmetrical in upper and lower extremities.  There were no pathological reflexes.  R. 319.  His chief complaint was a hold-up on a life insurance application because of a restrictive lung disease noted in his records.  R. 316.  He was to return in six months. R. 320.

On December 6, 2012, Robinson was seen for a follow-up psychology visit by a staff clinical psychologist.  R. 315-16.  He was living by himself.  He was compliant with his

psychiatric medications.  There was some improvement in his mood.  He was in lots of pain.  Although he drank heavily, at the time of the visit he limited his drinking to a couple of glasses of wine.  He saw his mother a lot to get his mail.  He had no plans for Christmas and would not go if invited.  He reported that he may look for a job to keep himself occupied.  He was considering volunteer work.  He denied suicidal thoughts.  R. 315.  He was to return in several weeks and take his medication.  R. 316.

On December 11 and 22, 2012, urine samples were analyzed.  No growth was found.  R. 671.  On December 20, 2012, there was a CT of the thorax because of a diagnosis of restrictive lung disease.  There was no evidence of interstitial lung disease.  A follow-up in one year was recommended to determine if scarring from a prior inflammatory process was stable.  There were mild degenerative changes in the spine.  R. 664-66, 819-21 and 1013-15.

### 2013

On January 3, 2013, Robinson fell.  R. 690.  On January 4, 2013, there were two x-ray views of the ribs because of trauma to the right side.  There was no fracture or other rib abnormalities.  R. 664, 819 and 1013.  On January 17, 2013, there was an ultrasound of the thyroid because of a possible thyroid nodule.  Three small cystic nodules were present within the thyroid gland.  No suspicious characteristics were identified.  R. 663 and 818-19 and 1012-13.

On February 3, 2013, there were nerve conduction studies and an EMG.  The diagnosis was bilateral carpal tunnel syndrome affecting motor and sensory fibers right worse than left.  There was chronic C-7 radiculopathy.  R. 661-63 and 816-17.

On February 7, 2013, there was a diagnosis by Dr. Hackley of anemia. R. 681.  On February 7, 2013, Dr. Hackley telephoned Robinson to report abnormal clinical findings and the results of lab tests.  R. 689-90.

On February 16, 2013, Robinson was seen by Cristino Dijamco, M.D., for a consultative examination. He got on and off the exam table and up and out of the chair without difficulty. R. 462. There was no effusion or redness over any joint. Ambulation and gait were normal. He did not require an assisting device to walk. R. 462. The physical examination was unremarkable with no clinical findings that would correlate with the allegations of problems with his back, neck and knees. The passive range of motion of joints and extremities was within functional limits. The straight leg test was negative, supine and sitting bilaterally. His medical records supported the allegations of cervical radiculopathy. The condition was stable. R. 463.

On February 22, 2013, Robinson had a 30 minute psychotherapy session with the clinical psychologist. R. 689. On the same day there were reports of a diagnosis of blood in stool and special screening for malignant neoplasms of the colon. R. 689. He participated in a video conference on preparing for a colonoscopy. R. 660-61. On February 26, 2013, he attended a nutrition class because of a diagnosis of pure hyperglyceridemia. R. 689.

On March 15, 2013, he received counseling and pre-op education for an Esophagogastroduodenoscopy ("EGD") and colonoscopy set for March 22, 2013. R. 655-59 and 689. On March 18 and 20, 2013, there were telephone contacts with a nurse and pre-surgery review for a colonoscopy. R. 652-55 and 688. On March 22, 2013, Robinson underwent the EGD and colonoscopy. R. 624-52. The biopsy was examined. There was no significant eosinophilia. No intestinal metaplasma was noted. R. 671-72 and 1018.

On June 3, 2013, Robinson did not show for his appointment. A nurse called him. Robinson stated he wanted to harm his mother and sister. His mother caused him pain and she was evil. He told the nurse he was too drunk to come to the clinic, but was depressed and needed help. The psychiatrist spent more than an hour in a crisis call with Robinson while police came

and took him to Lallie Kemp hospital.  R. 612-14.  On re-evaluation at Lallie Kemp, Robinson said he was drunk and just talking foolishness.  The doctor felt that his behavior was substance related and he was not a threat to himself or others.  He was discharged.  R. 468.  The mother was told of Robinson's threats.  She was unconcerned.  She went to pick him up at Lallie Kemp that day.  R. 615.  The sister also was not concerned about Robinson's threats.  R. 616.

The VA psychiatrist completed a suicide risk assessment and safety plan.  He was to come in for appointments at least once a week for thirty days.  R. 611 and 622-24. The diagnosis was homicidal and suicidal ideation.  R. 687 and 810-12.

On June 4, 2013, Robinson denied any thoughts of suicide.  R. 617.  On June 6, 2013, Robinson was in contact with Dr. Russell, the staff clinical psychologist, by telephone.  R. 601-02.  He reported thoughts of suicide but he never attempted to do it.  R. 804-05.  On June 5, 2013, Robinson reported a rash to Dr. Hackley's nurse.  R. 687.

On June 13, 2013, Robinson was seen by Dr. Russell for 25 minutes in follow-up for depression.  R. 597-600.  The current episode related to his fear of transition from military to civilian life, episodes he recalled from when he served on aircraft carriers, and problems with his mother and family.  R. 800-02.

On June 17, 2013, a disability benefits questionnaire was completed for PSTD by Penelope W. Dralle, Ph.D., a psychologist.  R. 524-38, 584-97 and 698-711.  Robinson reported that he wanted to get his binge drinking under control so he could either go to school or find an easy job to do.  He did not want to work under stressful conditions as he did in the Navy.  R. 596. His Axis V GAF score was 60.  R. 587.

On June 19, 2013, Robinson was seen by Dr. Russell for follow-up for PTSD, depression and alcohol abuse.  R. 582-84 and 786-87.  He was doing "okay."  R. 583.  He mostly stayed

home.  He took his medication when he was not drinking.  He denied suicidal and homicidal thoughts.  His affect was very serious and appropriate.  His mood was stable.  R. 583.

On June 21, 2013, Robinson called and spoke to Elizabeth Jensen, M.D., a psychiatrist, about a bill from Lallie Kemp hospital for services on June 3, 2013.  Robinson reported that the VA doctor ordered him to go to Lallie Kemp for homicidal and suicidal ideation.  R. 784.

On July 18, 2013, Robinson was seen by Dr. Russell for follow-up for PTSD and depression.  He watched TV, sat in his yard, and tried to stay to himself.  He received another bill from Lallie Kemp.  He had dreams from his Navy experiences.  R. 579-80 and 782-83.

On July 24, 2013, Robinson was seen by Dr. Jensen.  R. 575-576 and 781-82.  He was taking his medication as prescribed.  He did not report any side effects.  R. 576.  He denied suicide ideation and hallucinations.  He had nightmares.  R. 576.  The diagnosis was PTSD and depression.  R. 778-79 and 1007-10.

On July 25, 2013, the suicide prevention coordinator confirmed that Robinson was receiving the enhanced standard of care for veterans with a high risk flag. R. 685 and 1007.

As of August 1, 2013, Robinson was awarded service adjusted compensation relating to PTSD, cervical radiculopathy, carpal tunnel syndrome and instability in his right knee from degenerative arthritis.  R. 474-80.

On August 2, 2013, Dr. Russell sought to reach Robinson on the phone.  R. 777.

On August 15, 2013, Robinson requested a chest CT scan because of an earlier radiology report of a cyst on his right lung.  A CT scan was ordered.  R. 775-76 and 1005.  On August 29, 2013, there was a CT of the thorax.  There were minimal areas of ground glass nodular change in the chest.  They were of doubtful clinical significance.  There was a comparison with a

December 2012 exam.  A follow-up in a year to document long-term stability was recommended.  R. 774, 817-18, 1002-03 and 1011-12.

On August 30, 2013, Robinson had improved to the point where suicide was not considered a high risk.  R. 770-72 and 999-1002.

On September 13, 2013, Robinson reported swollen glands and a headache.  He was on a drinking binge every day for weeks.  He did not take his prescribed medication.  R. 769-70.  R. 998-99.

On September 18, 2013, Robinson was seen for a routine follow-up.  He complained of neck pain and requested contact with a doctor.  R. 761-69.  He complained of a rash.  R. 760-61.  He reported an issue with his vision and seeing "sun spots".  He was seen for follow-up for PSTD, depression and alcohol abuse.  R. 757-60.  An eye risk assessment was made.  R. 756-57.  His mental health treatment plan was updated by Dr. Russell, the staff clinical psychologist, and approved by Dr. Jenson, the psychiatrist.  R. 753-56 and 981-98.

On September 20, 2013, blood work for HIV was negative.  R. 752.

On September 23, 2013, satisfactory images were reported by a dermatology consult.  A referral to an outpatient clinic within six weeks was recommended.  R. 751-52 and 980-81.

On October 2, 2013, Robinson was seen for his medication list.  He refused the flu vaccine.  R. 750-51 and 978-80.  There was a dermatology consult.  Sun protection was discussed.  R. 748-49 and 977-78.

On October 4, 2013, Robinson was seen by Dr. Russell.  He watched TV and drank beer.  He did not take his medication when he drank beer.  He believed the beer kept him sane and better tempered.  The diagnosis was alcohol abuse, PTSD and depression.  He was to return in

January.  R. 746-47 and 975-76.  On October 30, 2013, Robinson was seen by Dr. Russell.  R. 744-45 and 973-74.

On December 6, 2013, a medical opinion summary was prepared by Dr. Dralle, a psychologist, by a review of available records.  The condition claimed by Robinson (binge drinking) was incurred in or caused by an in-service injury, event or illness.  R. 970-72.

On December 7, 2013, Robinson was seen for a consultative examination by M. Hunter Hansen, Ph.D., a psychologist.  R. 833-37.  The Axis V score was 65.  R. 836.  Dr. Hansen concluded that Robinson presented with symptoms of alcohol dependence.  The symptoms were chronic.  The diagnostic picture was complicated by behavior suggestive of poor effort.  The prognosis was guarded.  R. 836.

On December 11, 2013, Robinson called a nurse to report a nose injury and asked to see his doctor.  He reported that the accident occurred on November 29, 2013.  Nurse Lovato described Robinson's responses as short, curt and evasive.  R. 969.  An x-ray of the nose was ordered.  R. 970.  It revealed a possible nondisplaced fracture versus osseous suture.  A mild rightward nasal septal deviation was noted.  R. 1010.

On December 11, 2013, Robinson was seen for a physical medicine rehab consult for complaints of low back pain.  The physical exam did not support radiculopathy.  He did not want physical therapy or neck surgery.  Flexeril was prescribed for muscle spasms.  R. 966-69.

A December 12, 2013 x-ray of the lumbar spine showed normal alignment, disc interspaces were grossly preserved, posterior elements appeared unremarkable, and the sacrum and sacroiliac joints were grossly unremarkable.  R. 1010-11.

On December 12, 2013, a VA disability questionnaire was completed on his peripheral nerve condition. R. 955-66.  Robinson's neuropathy affected his dominant right hand.  R. 956.

His strength measurements (elbow, wrist, grip, pinch and ankle) were normal except for elbow extension.  R. 957-58.  He did not have muscle atrophy.  R. 958.  His deep tendon reflexes were normal.  R. 958.  His sensation testing for light touch was normal except for hand and fingers.  R. 958-59.  His upper extremity nerves and radicular groups were normal except for the median nerve and middle radicular group.  R. 960-61.  He used a brace to assist his walking.  R. 962. Robinson was unable to secure employment because of his peripheral nerve condition.  R. 966.

On December 16, 2013, VA questionnaires were completed on his:  back (R. 866-874, 915-923); forearm and elbow (R. 874-880, 923-929); knee and lower leg (R. 880-889, 929-936); cervical spine (R. 889-898, 937-945); wrists (R. 898-904, 945-951); and scars and disfigurement (R. 951-54).  The knee, lower leg, cervical spine and wrist conditions impacted his ability to work.  R. 889, 898, 904, 936, 945, 951.  The others did not impact his ability to work.

On December 16, 2013, there was an eye consult.  R. 911-15.

On December 20, 2013, there was a suicide risk assessment.  Robinson reported that he was depressed, but was not actively suicidal.  He had occasional thoughts of suicide.  He wanted to be happier.  R. 908-10.  The diagnosis was PTSD, alcohol abuse and depression.  R. 910-11.

## 2014

On January 17, 2014, Robinson was seen by a nurse.  He reported that he burned his left shin on a home floor heater on December 16, 2013.  The pain was minimal.  A tetanus/diphtheria vaccine was administered.  R. 905-08.  On January 17, 2014, he reported that he was at risk for Hepatitis C.  A pressure ulcer risk screen score was zero.  He was not a risk.  R. 907.

On February 28, 2014, Robinson was notified of entitlement on his claim for service connected disability compensation.  R. 1024-42 and 1024-61.

e.      **Plaintiff's Appeal**.

**Issue No. 1**.     Is the ALJ's finding that Robinson could perform frequent bilateral fingering, feeling, and handling contrary to the evidence of record?

The ALJ found that Robinson had the residual functional capacity to perform light work except with frequent bilateral fingering, feeling, and handling.  R. 15.  Robinson contends that substantial evidence does not support this finding.  Rec. doc. 11 (Memorandum at 19-21).

Robinson testified that he could not work because of carpal tunnel syndrome and problems with his knees and neck.  He testified that sometimes he could barely write.  R. 47.  He was diagnosed with carpal tunnel syndrome in the Navy.  R. 48.  He wore wrist braces at night. R. 45 and 48.

The physical examinations by Drs. Dijamco, Lan Tran, Gaines and Burris are relevant.

On February 16, 2013, Robinson was examined by Dr. Dijamco.  R. 461-63.  His findings included, "[r]adial pulses 2+ and equal. . . .  Grip was 5/5 and symmetrical with good dexterity and grasping ability."  R. 462.  Dr. Dijamco concluded:

> The physical examination was essentially unremarkable with no clinical findings that could correlate with the allegations.  His passive range of motions of joints and extremities were within functional limits.

R. 463.

On December 11, 2013, Robinson was seen by Jennifer Lan Tran, M.D., a VA resident, for a physical medicine rehabilitation consult.  R. 966-68.  The physical exam found that except for rotation of the neck to the right limited by pain, there was a full active range of motion for the spine and upper extremities, 5/5 strength, 2+ deep tendon reflexes, and sensation to light touch intact in all dermatones.   The physical examination did not support radiculopathy despite Robinson's reports of numbness in the lower extremities.  As to the cervical spinal stenosis and carpal tunnel syndrome:  (1) Robinson's last EMG was two years before; (2) he reported

24

neuropathic symptoms bilaterally in his arms; (3) sensation and strength were intact in the upper extremities bilaterally; (4) a further EMG was recommended but Robinson did not want to stay to have it done; (5) in the past a neurosurgeon recommended against surgery; and (6) he was not interested in surgery in December 2013.  R. 968.  Dr. Lan Tran's report was discussed and evaluated with Robert Mipro, M.D., a staff physician.  R. 968-69.

On December 16, 2013, Camalyn Gaines, M.D., performed a VA general medical examination of Robinson for a disability examination.  R. 850.  Dr. Gaines completed questionnaires for the:  (1) elbows and forearms (R. 874-80 and 904); (2) neck (R. 889-98 and 904); and (3) wrists (R. 898-905).  Robinson reported that he fractured his left elbow in 1986. He complained of intermittent pain in the left elbow after heavy lifting.  He also reported flare-ups of pain with increased lifting and pressure on the elbow.  R. 875.  Where normal flexion ends at 145, Dr. Gaines found 140 for the right elbow.  There was no objective evidence of painful motion.  R. 876.  Similarly there was no objective evidence of painful motion for right elbow extension.  R. 876.  The results were the same for left elbow flexion and extension.  R. 876-77. Robinson could perform repetitive-use testing with three repetitions.  R. 877.  After such testing, the results for flexion and extension were the same as for before the test.  R. 877.  There was a functional loss or impairment in the elbow.  R. 878.  Pain on movement was noted in the left elbow.  R. 878.  The flexion and extension strength was normal for the elbows.  R. 878-79. There was increased pain at the left elbow with resisted wrist flexion.  R. 880.

Dr. Gaines noted that Robinson was diagnosed with cervical intervertebral disc syndrome.  He reported that the pain began in 2008.  He received physical therapy.  Surgery was recommended, but he declined it.  R. 890-91.  There were limitations in the range of movement. R. 891-92.  Similar results were found after completion of the repetitive-use test.  R. 892-93.

25

Robinson reported pain on movement of the neck.  R. 893.  There was localized pain to palpation for the neck.  R. 893.  Muscle strength was normal.  There was no muscle atrophy.  R. 894. Deep tendon reflexes were normal.  R. 895.  Sensation to light touch was decreased for the left shoulder, and normal for other areas.  R. 895.  He reported no pain in the right and left upper extremities.  R. 895.  He reported mild paresthesia (sensation of burning, numbness) on the left upper extremity.  There were no other signs of radiculopathy.  R. 896.  He reported increased neck pain using a computer in his job with the Navy as an administrator.  R. 898.

Dr. Gaines noted that in 2004, he was evaluated in an emergency room for the acute onset of left arm numbness and diagnosed with carpal tunnel syndrome.  While he received wrist splints, he did not receive steroid injections or surgical intervention.  He reported numbness in his hands before going to bed.  R. 899-900.  For the right wrist, the flexion and extension were normal and there was no objective evidence of painful motion.  R. 900.  For the left wrist, there were limitations for flexion and extension, but no objective evidence of painful motion.  R. 900-01.  The results were about the same after repetitive-use testing as they were before the testing. R. 901-02.  There was no localized pain on palpation at either wrist.  R. 902.  Muscle strength was normal.  The Tinel's Sign test (wrist flexion) was positive bilaterally.  R. 903.  X-rays showed degenerative arthritis.  R. 903.  Robinson experienced increased wrist pain while using a computer in his Navy job as an administrator.  R. 904.

On December 12, 2013, Debra Burris, M.D., examined Robinson and completed a peripheral nerve condition questionnaire.  R. 955-66.  He reported moderate pain and severe numbness in the right upper extremity and mild pain and moderate numbness in the left upper extremity.  R. 956.  Dr. Burris found muscle strength was normal except left and right elbow extension where there was active movement against some resistance. R. 957.  There was no

muscle atrophy.  R. 958.  Deep tendon reflexes were normal.  R. 958.  The sensory exam was normal except for hand and fingers (C6-C8), where it was decreased.  R. 959.  The Phalen's sign and Tinel's sign tests were positive.  For upper extremity nerves and radicular groups, the nerves were normal except for the right and left median nerves (mild incomplete paralysis) and middle radicular group (mild incomplete paralysis).  R. 960-61.  Dr. Burris concluded that the nerve condition impacted Robinson's ability to work, he could not secure employment using his hands when he typed or for repetitive activities, and he could not lift, push or pull over 10 pounds due to his cervical degenerative disease with bilateral cervical radiculopathies.  R. 966.

The ALJ found that Dr. Burris based her opinion on Robinson's subjective complaints and diagnostic test evidence.  R. 23.  The ALJ noted that Robinson's only treatment for pain and numbness was Flexeril, he did not take physical therapy, he took no prescription or over-the-counter medication for mechanical or neuropathic pain, he refused steroid injections, and he was not referred for cervical or carpal tunnel release surgery.  R. 23  The ALJ determined to give little weight to Dr. Burris' opinion and great weight to unremarkable VA physical examinations, including Dr. Lan Tran's examination, and Dr. Dijamco's examination. R. 23.

Robinson's argument that substantial evidence does not support the ALJ's finding regarding frequent bilateral fingering, feeling, and handling focuses on the reports by Drs. Lan Tran, Gaines and Burris.  It ignores Dr. Dijamco's report that the physical examination was essentially unremarkable with no clinical findings that could correlate with his allegations.  R. 463

In Muse v. Sullivan, 925 F.2d 785, 790 (5th Cir. 2000), the Fifth Circuit said, "[t]he ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record."  Id.  The ALJ chose to give greater

weight to the opinion of Dr. Dijamco.   There is substantial evidence to support the ALJ's finding.

The ALJ also chose to give greater weight to the opinion of Dr. Lan Tran.   The physical exam found that except for rotation of the neck to the right limited by pain, there was a full active range of motion for the spine and upper extremities; 5/5 strength; 2+ deep tendon reflexes; and sensation to light touch intact in all dermatones.   R. 968.   Although Dr. Lan Tran noted that Robinson reported neuropathic symptoms bilaterally in his arms, sensation and strength were intact in the upper extremities bilaterally.   Dr. Lan Tran's report is substantial evidence for the ALJ's finding.

The ALJ described Dr. Lan Tran's conclusions as inconsistent with the limitations assessed by Dr. Burris.   R. 23.   Robinson argues that Dr. Tran's evaluation cannot reasonably be accepted as contrary to the opinions by Drs. Gaines and Dr. Burris.   Rec. doc. 11 (Memorandum at 20-21).   Dr. Lan Tran noted an inconsistency between Robinson's subjective report of neuropathic symptoms bilaterally in his arms and her findings that sensation and strength were intact in the upper extremities bilaterally.   Drs. Gaines and Burris accepted Robinson's subjective complaints and reports of his limitations.   For example, Robinson's report that he experienced increased wrist pain while using a computer in the Navy was accepted by Dr. Gaines (R. 904).   Dr. Lan Tran's conclusions are inconsistent with those of Drs. Gaines and Burris.

Moreover, findings by Dr. Gaines and Dr. Burris provide substantial evidence for the ALJ's finding.   Dr. Burris found no muscle atrophy and normal deep tendon reflexes.   R. 958. On the examination of the wrists, Dr. Gaines found no localized pain on palpation at either wrist (R. 902) and muscle strength was normal (R. 903).

There is substantial evidence to support the ALJ's finding that Robinson had the residual functional capacity to perform light work except with frequent bilateral fingering, feeling, and handling.

**Issue No. 2**.    Did the ALJ properly find that Robinson could perform the standing and walking requirements of light work?

In 2008, Robinson was diagnosed with a meniscus tear in the left knee and osteoarthritis in the right knee. R. 882. On December 16, 2013, Dr. Gaines examined him. R. 880-89 and 904. He did not report flare-ups that impacted the function of the knees. The range of motion in the right knee was less than normal, but there was no objective evidence of painful motion. R. 882-83. The range of motion of the left knee was even more limited than the right knee and there was objective evidence of painful motion. R. 883. The results were similar after repetitive-use testing. R. 884. Robinson had a functional loss or functional impairment of his knees. R. 884. Muscle strength was normal. R. 885. He used braces on both knees. R. 888. Dr. Gaines concluded that Robinson's knee condition impacted his ability to work. R. 888-89. He could not perform the prolonged standing and lifting activities at work in the Navy. R. 889.

The issue is not whether Robinson could perform his past relevant work as a launch and recovery technician. The ALJ found that he could not. R. 26. The ALJ did find that he could perform light work, which requires standing and/or walking six hours a day. Robinson contends that Dr. Gaines' examination demonstrates that he could not do light work.

Dr. Lan Tran found that Robinson had a full range of motion in the lower extremities with normal muscle strength bilaterally in the lower extremities. R. 968. Dr. Dijamco found that the passive range of motions of joints and extremities were within functional limits. R. 463. Robinson lived alone. He did household chores, including washing dishes, laundry and going to the grocery store. R. 57-58. For exercise, he tried to ride his bike every day or walk down the

street.  R. 60 and 63.  In December 2010, Dr. McDonald, the consulting psychologist, noted that Robinson accompanied him to an office on the second floor with no disturbance of gait or balance.  R. 256.

There is substantial evidence to support the ALJ's finding that Robinson could perform the standing and walking requirements for light work.

**Issue No. 3**.    Does substantial evidence support the ALJ's mental RFC assessment?

The ALJ found that Robinson was limited to simple and routine tasks and occasional interaction with supervisors, coworkers and the public.  R. 15.  Robinson urges that substantial evidence does not support this finding.

A.  Medication.

The ALJ incorrectly noted that the VA records reflected that prior to mid-2013, psychotropic medication was not prescribed for Robinson.  R. 14.  Effexor, an anti-depressant, was prescribed on September 21, 2012 by John Jackson, M.D., a VA psychiatrist.  R. 392-93.

The Commissioner contends that the ALJ's incorrect reference to the absence of medication prior to June 2013 was not harmful error because the lack of medication was not the sole basis for the ALJ's mental RFC.  The Commissioner urges that procedural perfection in administrative proceedings is not required.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988).

After the September 21, 2012 mental health consult with James Russell, Ph.D., staff clinical psychologist, Robinson returned to him on December 6, 2012 (R. 315-16) and on February 22, 2013 (R. 689).  The ALJ correctly described the frequency of counseling prior to mid-2013 as minimal.

The ALJ correctly noted that until June 2013 Robinson did not complain of traumatic recollections of death and injuries to others while in the Navy.  R. 14.

On the Global Assessment of Functioning a score in the range of 61-70 indicates some mild symptoms, but generally functioning well. A score of 51 to 60 indicates moderate symptoms or moderate difficulty in occupational functioning. On December 2, 2010, the consulting psychologist, Randi McDonald, Ph.D., assigned a GAF of 65. R. 258. On June 17, 2013, Penelope Dralle, M.D., a VA psychologist, assigned a GAF of 60. R. 527. On December 7, 2013, a consulting examining psychologist, Hunter Hansen, Ph.D., assigned a GAF of 65. R. 836.

While the ALJ's statement on when Robinson began taking psychotropic medication was incorrect, the mental RFC was based on other factors including the minimal counseling prior to mid-2013, the absence of complaints of traumatic events in the Navy prior to mid-2013, and GAF scores of 60-65. Robinson's substantial rights were not affected by the ALJ's error concerning the timing of the psychotropic medication.

B. Penelope W. Dralle, Ph.D.

On December 6, 2013, Dr. Dralle completed a disability benefits questionnaire concerning the PTSD diagnosis. R. 970-972. The report was electronically signed by Dr. Dralle (R. 972). On the next page of the record (R. 973), an administrative note relating to the report is shown as electronically signed by Kimberly Pollard, a VA patient services assistant. The ALJ referred to Dr. Dralle's report as completed by Ms. Pollard rather than Dr. Dralle. R. 24. After describing the report, the ALJ stated:

> Based on the entire record, even if the mental health opinion was considered to be the opinion of a treating physician, such as Dr. Russell, as opposed to the opinion on an administrative assistant, it is given little weight as being inconsistent with and unsupported by the balance of the objective evidence.

R. 24. Inasmuch as the ALJ treated the report as the opinion of a treating psychologist, the ALJ's error in identifying it as prepared by the patient services assistant did not affect Robinson's substantial rights.

C. Traumatic Experiences.

Robinson was diagnosed with PTSD in June 2013 by Dr. Russell. R. 597-600. At that time, Robinson reported on his traumatic experiences in the Navy. R. 598. On June 17, 2013, Dr. Dralle completed a PTSD questionnaire for Robinson's VA disability claim. R. 524-538. Robinson described his traumatic Navy experiences to Dr. Dralle. R. 533-34. Robinson contends that the ALJ failed to consider the evaluations by Drs. Russell and Dralle and failed to mention the traumatic events. Rec. doc. 11 (Memorandum at 22). Robinson is incorrect. The ALJ stated, "beginning in about mid-2013, the claimant began to complain of traumatic recollections of death and injuries to others and being near dangerous equipment on the flight deck while in the Navy." R. 14.

> The claimant proceeded to complain of trauma related to racism, narrow escapes from injury, exposure to dangerous equipment, and exposure to accidental deaths and injuries to others. Based on the evaluation, Dr. Russell diagnosed the claimant with alcohol abuse, depression, and post-traumatic stress disorder.

R. 20 (emphasis added). The ALJ considered the traumatic events and Dr. Russell's evaluation. The ALJ referred to subsequent psychological progress notes (R. 20), but did not refer specifically to the questionnaire completed by Dr. Dralle.

D. Malingering Test.

The Disability Determinations Service requested a mental status examination without additional testing from M. Hunter Hansen, Ph.D., a psychologist. R. 832. The evaluation was on December 7, 2013. R. 832-33. Despite instructions not to additionally test, Dr. Hansen administered the Rey 15 test to measure effort. The score was 7/15 which Dr. Hansen described

as indicative of inadequate effort.  R. 834.  On December 9, 2013, Lawrence Guidry, Ph.D., a state agency psychologist, completed a disability determination explanation.  R. 76-89.  With reference to Dr. Hansen's report, the Rey 15 test result was noted by Dr. Guidry.  R. 81.  The ALJ referred to the Rey 15 test score and Dr. Hansen's comment (R. 21) and Dr. Guidry's note of the test score (R. 26).

Robinson contends that:  (1) the Commissioner does not consider malingering tests reliable and prohibits their use; (2) the Commissioner prohibits the purchase of malingering and credibility tests because malingering cannot be proven with tests; (3) there is no test that conclusively determines the presence of inaccurate patient self-report; (4) even a high likelihood of malingering does not preclude severe limitations; and (5) the ALJ's reliance on the test to find that Robinson puts forth poor effort was improper.  Rec. doc. 11 (Memorandum at 24).

The Commissioner responds that:  (1) a malingering test was not ordered; (2) it paid for Dr. Hansen's examination without additional testing; (3) Dr. Hansen's administration of the test (and the ALJ's reference to it) is not harmful error; and (4) the Social Security Administration authority at issue notes that when the results of a Symptoms Validity Test are part of the medical evidence of record, the Commission will consider them along with all the relevant evidence in the case record.[1]  Rec. doc. 12 (Memorandum at 11-12).

More importantly, the ALJ's decision demonstrates that he did not determine Robinson's mental RFC based on the results of the Rey 15 test.  The ALJ's summary at R. 24-25 contains no reference to the test.  Instead it focuses on:  (1) how the mental status examinations and the lack of aggressive mental health treatment attempts contradict Robinson's assertions of marked PTSD

---

[1]  Both parties cite Program Operations Manual System ("POMS") DI 22510.006(D).  Rec. docs. 11 (Memorandum at 24) and 12 (Memorandum at 11-12).  The POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits. The public version of POMS is identical to the version used by Social Security employees except that it does not include internal data entry and sensitive content instructions.  See secure.ssa.gov/apps10/.

and depression symptoms; (2) the relatively unremarkable mental and physical examinations and drug treatment; (3) the weight given to the VA progress notes and the reports of the consultative examiners; (4) the little weight given to the opinions of Drs. Burris, Dralle and Russell; and (5) the lack of credibility concerning Robinson's alleged limitations.  R. 24-25.

E.  Mental Status Examinations.

After noting Robinson's mental health treatment prior to mid-2013, including the erroneous reference to the absence of psychotropic medication prior to mid-2013, the ALJ described Robinson's complaints, including his traumatic Navy experiences and the June 2013 episode of heavy drinking.  R. 14.  The ALJ stated:

> Regardless, even after the June 2013 alcohol-induced episode and subsequent diagnoses of post-traumatic stress disorder, the claimant's mental status examinations remained relatively unremarkable.  Specifically, while he regularly complained of a depressed mood, self-isolation, irritability, and poor memory, concentration, and persistence to task completion, the claimant typically had relatively unremarkable mental status examinations and a Global Assessment of Functioning (GAF) of 60 to 65.

R. 14 (emphasis added).  Robinson contends that the ALJ improperly focuses on the normal parts of the examinations to the exclusion of the parts that establish the severity of his PTSD and depression.  Rec. doc. 11 (Memorandum at 23).  The ALJ's description of the mental status exams as relatively unremarkable emphasizes the examinations made after the June 2013 incident.

After that incident, Robinson was seen by Dr. Russell in follow-up for depression on June 13, 2013.  R. 597-600.  On June 19, 2013, Robinson returned to Dr. Russell for follow-up for PTSD, depression and alcohol abuse.  R. 582-84 and 786-87.  He was doing "okay."  R. 583.  He denied suicidal and homicidal thoughts.  His affect was very serious and appropriate.  His mood was stable.  R. 583.

On July 18, 2013, Robinson was seen by Dr. Russell for follow-up for PTSD and depression. He watched TV, sat in his yard, and tried to stay to himself. He had dreams from his Navy experiences. R. 579-80 and 782-83. On July 24, 2013, Robinson was seen by a psychiatrist. R. 575-576 and 781-82. He was taking his medication as prescribed. He did not report any side effects. R. 576. He denied suicide ideation and hallucinations. He had nightmares. R. 576. The diagnosis was PTSD and depression. R. 778-79 and 1007-10.

On September 18, 2013, Robinson was seen for follow-up for PSTD, depression and alcohol abuse. R. 757-60. An updated mental health treatment plan was provided. R. 753-56 and R. 985-98. His mental health treatment plan was updated by Dr. Russell. R. 981-85.

On October 4, 2013, Robinson was seen by Dr. Russell. He watched TV and drank beer. He believed that the beer kept him sane and better tempered. The diagnosis was alcohol abuse, PTSD and depression. R. 746-47 and 975-76. On October 30, 2013, Robinson returned to Dr. Russell. Robinson's mood was depressed and anxious. R. 744-45 and 973-74.

On December 7, 2013, Robinson was seen for a consultative examination by M. Hunter Hansen, Ph.D. R. 833-37. The Axis V score was 65. R. 836. Dr. Hansen concluded that Robinson presented with symptoms of alcohol dependence. The symptoms were chronic. The diagnostic picture was complicated by behavior suggestive of poor effort. The prognosis was guarded. R. 836.

On December 20, 2013, Robinson returned to Dr. Russell. The mental status evaluation was:

> [A]lert, oriented, pleasant and conversant – Intact thought processes with good pitch, volume, and rate of speech; content relevant without undue focus. Denied hallucinations and delusions. No apparent frank paranoia. Denied suicidal and homicidal thoughts. Affect full range, appropriate. Mood stable.

R. 911.  A treatment plan was set.  R. 909-911.  Robinson was still depressed but he was not actively suicidal.  He did have occasional thoughts of suicide.  Dr. Russell recommended against flagging him as a high risk for suicide.  R. 909.  Robinson concedes that there were no abnormalities at the December 20, 2013 examination.  Rec. doc. 11 (Memorandum at 23).

"[R]elatively unremarkable" is an inexact term.  The ALJ focused on the mental status examinations after the June 3, 2013 incident.  There were no abnormalities reported at the December 20, 2013 examination which was the last mental status examination before the hearing with the ALJ on February 19, 2014.  The ALJ's description of the mental status examinations after June 3, 2013 as relatively unremarkable does not demonstrate a misstatement of the evidence or a lack of substantial evidence for the mental portion of the RFC.

F.  Robinson's Credibility.

Implicit in the appeal is a challenge to the ALJ's finding on credibility.  The ALJ stated that in reaching the conclusions with regard to the RFC, Robinson's subjective assertions were given as much consideration as possible. R. 25.  The ALJ noted that:  Robinson lived alone; he shopped for groceries as needed; he visited with friends two to three times per week; he saw his girlfriend on the weekends; he visited his mother regularly; and, while he spent most of his time watching television or sleeping, he exercised by riding his bicycle or walking (Tr. 41-42 57-58, 62-64).  Based on the evidence of his daily and social functioning, the ALJ questioned his credibility.  The ALJ determined that Robinson's assertions relating to his symptoms, limitations and restrictions were exaggerated. R. 25.  There is substantial evidence for this finding.

G.  Substantial Evidence for Mental Portion of RFC.

Robinson contends that:  (1) every psychiatrist or psychologist who examined or treated him indicated that he was more limited than the ALJ found;[2] (2) the ALJ rejected these opinions even though they were supported by objective findings in the mental status examinations and other evidence; and (3) they were consistent with greater limitations in sustaining tasks and coping with performance in a workplace.  For example, Robinson contends that Dr. Russell's notes reflect difficulty in getting him to discuss his traumatic experiences (R. 579, 583), and in December 2013, he was not ready to confront the fears related to his trauma (R. 911).  He cites the ALJ's findings that:  (1) the opinion of Dr. Dralle was inconsistent with and unsupported by the balance of objective evidence; and (2) Dr. Dralle's opinion was based on Robinson's subjective assertions (R. 24).   Robinson argues that the ALJ's failure to account for this extensive objective evidence renders the RFC unsupported by substantial evidence.

The ALJ found that:  (1) medical evidence supported that Robinson was diagnosed with impairments including depression and PTSD (R. 25, para. 1);   (2) the impairments could reasonably be expected to cause Robinson's alleged symptoms (R. 16 at para. 2); (3) the impairments could reasonably cause certain mental limitations consistent with those in the RFC (R. 25 at para. 2); and (4) Robinson's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible (R. 16 at para. 2).  As noted in subpart F, there is substantial evidence for the ALJ's finding on credibility.

On June 17, 2013, Dr. Dralle completed a PTSD questionnaire.  R. 524-38. Robinson reported to Dr. Dralle that he was present with his girlfriend of about a year (R. 530).  The ALJ

---

[2]  Robinson contends that the opinions of consultative examiner Dr. McDonald (R. 258), treating psychologist Dr. Russell (R. 579, 583, 772 and 911), treating psychologist Dr. Dralle. (R. 970–72), consultative examiner Dr. Hansen (R. 837), and non-examining consultant Dr. Guidry (R. 86) establish that he had greater limitations in his ability to remain on task and persist during a workday than the ALJ included in the RFC.

cited Robinson's testimony at the February 19, 2014 hearing concerning his daily activities and social contact with his friends.  R. 57-64.  Notwithstanding his complaints to Dr. Dralle of significant social dysfunction, the ALJ noted that he maintained his activities through the time of the hearing.  R. 21 at para. 2 and R. 22 at para. 2.  The ALJ's description of these activities and relationships is documented in record.  The ALJ cited them as evidence for his conclusion that the record did not demonstrate the type and severity of symptoms claimed by Robinson.  R. 25 at paras. 3-4.  There is substantial evidence for this finding.

In October 2010, Robinson reported drinking four or more times per week and 10 or more drinks at a time.  R. 241.  His drinking began in the Navy.  The ALJ noted that alcohol abuse did not prevent him from serving on aircraft carriers.  R. 20 at para. 2.  In October 2010, Dr. Counselman advised him to quit drinking.  R. 245  On July 14, 2012, Dr. Hackley urged him to stop drinking in order to save his liver and pancreas.  R. 398.  He declined the offer of resources to help him stop drinking.  R. 397.  The June 3, 2013 incident that resulted in an emergency trip to Lallie Kemp hospital was attributed to alcohol abuse.  R. 468.  On December 6, 2013, Robinson complained that he felt out of control because of his drinking behavior.  R. 971.  Dr. Dralle accepted Robinson's complaints in finding him unemployable.  R. 971-72.  Even though at times Robinson said he wanted to get his drinking under control (R. 596), he did not participate in substance abuse treatment.  The ALJ noted his refusal to participate in such treatment.  R. 24 at paras. 3 and 4.

The ALJ commented that there was very little mental health treatment prior June 2013 (see subpart A above).  In the seven months following the June 3, 2013 incident there was more treatment, including counseling and medication.   The treatment remained relatively unremarkable in light of Robinson's alleged severity of symptoms.  R. 24 at para. 4.  Other than

a few hours at Lallie Kemp on June 3, 2013 (R. 468), Robinson was not hospitalized for his mental condition.

On the June 13, 2013 follow up visit with Dr. Russell, the mental status examination found Robinson, alert, oriented, pleasant and conversant; and with intact thought processes.  The affect was full range, appropriate and mostly serious.  The mood was anxious and depressed.  R. 598.  Robinson returned to Dr. Russell six days later.  R. 582-84.  The results of the mental status examination were the same as on June 13, except the affect was very serious and appropriate, and the mood had improved to stable.  R. 583.

On July 18, 2013, Robinson returned to Dr. Russell.  He told Dr. Russell that there was a lot going on and he was not in the mood to be social.  He reported or complained that he received another bill from Lallie Kemp hospital.  "He has spoken with everybody involved.  He has been on the phone a lot trying to get the bills taken care of."  R. 579.  He also reported a dream about being back on the boats.  The results of the mental health examination were the same as for June 13 and 19, except the affect was constricted.  The mood remained stable.  R. 579.

On July 24, 2013, Robinson was seen by Dr. Jensen, a psychiatrist, who concluded that Robinson was not gravely disabled and inpatient admission was not required.  The results of the mental health examination were similar to the other examinations after the June 3, 2013 alcohol induced incident, except that the affect was calm, reflective and a little sad.  R. 575-76.  On September 18, 2013, the results of a mental status examination by Dr. Russell were the same as the others except the affect was sad, while the mood remained stable.  R. 758.  On October 4, 2013, Dr. Russell found the affect sullen and mood dysphoric.  The remainder of the results of the mental status examination were as for the prior examinations.  R. 747.

The results of Dr. Hansen's December 7, 2013 mental status examination were similar to the prior ones.  R. 833-36  The GAF was 65.  R. 836.  The limitations described by Dr. Hansen are consistent with those found in the RFC.  R. 836-37.  On December 20, 2013, Dr. Russell found the affect was full range and appropriate.  Robinson's mood was stable.  The remainder of the mental status examination was as before.  R. 911.  On January 17, 2014, Robinson was seen by a nurse, who described him as alert.  R. 905.

When Dr. Dralle completed a PTSD questionnaire, she indicated that Robinson had difficulty in establishing and maintaining social relationships.  R. 537.  The ALJ found this was inconsistent with Robinson's social functioning.  The ALJ determined to give Dr. Dralle's opinion little weight.  R. 24 at para. 3.  He also assigned little weight to Dr. Russell's opinion.  R. 25 at para. 4.

H.  Conclusion.

Robinson contends that because all of the evidence of record consistently establishes that he has difficulties concentrating, dealing with stress, and handling new tasks, the record establishes that he has a limitation in his ability to remain on task that renders him disabled.  As regards the evidence, the function of this Court is limited to determining whether there is substantial evidence to support the Commissioner's decision.  The Court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.  Yet, this is what Robinson asks the Court to do.

## RECOMMENDATION

IT IS RECOMMENDED that:  (1) the Commissioner's cross-motion for summary judgment (Rec. doc. 12) be GRANTED; and (2) Robinson's motion for summary judgment (Rec. doc. 11) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 14th day of April, 2015.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**

41